952 F.2d 795
 60 USLW 2450, 25 Collier Bankr.Cas.2d 1719,
22 Bankr.Ct.Dec. 717, Bankr. L. Rep. P 74,401,
16 UCC Rep.Serv.2d 417
 In re Dewey BAREFOOT, d/b/a
D & M Mobile Home, Debtor.
Carol A. MORRISON, Trustee in Bankruptcy for Dewey Barefoot,
individually and d/b/a D & M Mobile Home, D & M Homes, D & M
Mobile No. 91-2052 Home and Auto Sales, and D & M Housing
Center, Plaintiff-Appellee,
v.
CHAMPION CREDIT CORPORATION; Chrysler First Commercial
Corporation, Defendants-Appellants.
 No. 91-2052.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 3, 1991.
Decided Dec. 18, 1991.
 
 Nancy Marie Guyton, Murchison, Taylor, Kendrick, Gibson & Davenport, Wilmington, N.C., argued (Barbara J. Sullivan, on brief), for defendants-appellants.
 Algernon Lee Butler, Jr., Wilmington, N.C., argued, for plaintiff-appellee.
 Before WIDENER, WILKINSON and WILKINS, Circuit Judges.OPINION
 WILKINSON, Circuit Judge:
 
 
 1
 The issue in this case is whether payments made by a debtor to an unsecured creditor in the ninety days preceding bankruptcy constitute an avoidable preference under 11 U.S.C. § 547(b) when the purpose of the transfers was to make good a check of the debtor that had bounced prior to the ninety-day period. The bankruptcy court ruled that the payments were preferences, and the district court affirmed that holding.
 
 
 2
 We now affirm the district court. We find all elements of a section 547(b) preference to be present, and we reject appellants' assertions under 11 U.S.C. § 547(c) that either the contemporaneous exchange for new value defense or the ordinary course of business defense applies here. Furthermore, we reject appellants' request that we engage in a case-specific examination of the equities involved in the transactions at issue to determine who should ultimately receive the disputed funds. Instead, in conformity with the statute's language and purposes, we hold that any payment to an unsecured creditor within the ninety-day preference period to make good a bounced check is an avoidable preference provided that the requirements for an avoidable preference are otherwise satisfied.
 
 I.
 
 3
 Dewey Barefoot, doing business as D & M Mobile Homes (D & M), entered into a floor plan financing agreement with Champion Credit Corporation (Champion). Under this agreement, Champion loaned money to D & M for the purchase of mobile homes from Champion Home Builders to be resold to the public, and Champion took a purchase money security interest in the portion of D & M's inventory that it had financed and in all proceeds thereof. D & M agreed to repay the loans as it sold each unit, and Champion reserved the right to demand payment at any earlier point. Champion also held the certificate of origin for each mobile home and did not release the certificate until D & M repaid the outstanding indebtedness for the relevant mobile home.
 
 
 4
 On April 20, 1987, Champion received a check from D & M in the amount of $133,538.00 to repay the amounts owed on five mobile homes which D & M had sold to customers. Champion released the certificates of origin for the five homes before learning on April 30, 1987, that D & M's check had been dishonored. This was the first time that one of D & M's checks to Champion had bounced. To make up for the bounced check, D & M then sent Champion's parent company, Chrysler First Commercial Corporation (Chrysler First), three wire transfers totalling $109,664.07: (1) $30,000.00 on May 13, 1987; (2) $44,644.07 on May 29, 1987; and (3) $35,000.00 on June 3, 1987. All parties agree both that Champion had taken all necessary steps to perfect its security interest in the five mobile homes and that the release of the certificates released the security interest in the five units.
 
 
 5
 An involuntary Chapter 7 bankruptcy petition was filed on behalf of Dewey Barefoot on August 5, 1987. The trustee in bankruptcy then brought this action against Champion and Chrysler First on October 26, 1989, seeking to set aside the three wire transfers as preferences occurring within ninety days of the filing of the bankruptcy petition. After conducting an evidentiary hearing, the bankruptcy court ruled in favor of the trustee and ordered the defendants to pay the trustee $109,664.07 plus interest. On appeal, the district court affirmed the bankruptcy court's decision. Appellants now contest those rulings.
 
 II.
 
 6
 The bankruptcy trustee's power to avoid preferential transfers to creditors in the ninety days preceding bankruptcy stems from 11 U.S.C. § 547(b). Two purposes animate this statutory avoidance power. First, the avoidance power promotes the "prime bankruptcy policy of equality of distribution among creditors" by ensuring that all creditors of the same class will receive the same pro rata share of the debtor's estate. H.R.Rep. No. 595, supra, at 177-78, reprinted in 1978 U.S.Code Cong. & Admin.News at 6137-6139. Second, the avoidance power discourages creditors from attempting to outmaneuver each other in an effort to carve up a financially unstable debtor and offers a concurrent opportunity for the debtor to work out its financial difficulties in an atmosphere conducive to cooperation. H.R.Rep. No. 595, 95th Cong., 2d Sess. 177 (1978), reprinted in 1978 U.S.Code Cong. & Admin.News 5963, 6137-6138; In re Fuel Oil Supply & Terminaling, Inc., 837 F.2d 224, 227 (5th Cir.1988).
 
 
 7
 Under 11 U.S.C. § 547(b), there are six elements that must be proved in order for a transfer to be set aside as preferential. The transfer must have been: (1) of an interest of the debtor in property; (2) to or for the benefit of a creditor; (3) for or on account of an antecedent debt owed by the debtor before the transfer was made; (4) made while the debtor was insolvent; (5) made on or within ninety days of the filing of the bankruptcy petition; and (6) it must enable the creditor to receive a greater percentage of its claim than it would under the normal distributive provisions in a liquidation case under the Bankruptcy Code. 11 U.S.C. § 547(b). We shall address in this section Champion's contention that various elements of a preferential transfer have not been made out.
 
 A.
 
 8
 Champion contends that the district court's conclusion that the transfers had been made on or within ninety days of the filing of the bankruptcy petition is in error. The dispute on this point involves whether to look at the date of delivery of the dishonored check or to the actual dates of the wire transfers in assessing whether the transfers fell within the ninety-day preference period. Champion cites a number of prior opinions of this court for the proposition that the date of delivery of the check operates to fix the time of transfer. See In re Virginia Information Systems Corp., 932 F.2d 338, 341-42 (4th Cir.1991) (involving date of transfer under § 547(b)); Quinn Wholesale, Inc. v. Northen, 873 F.2d 77, 78 (4th Cir.1989) (involving avoidance powers of trustee for post-petition transfers under 11 U.S.C. § 549(a)(1)); In re Continental Commodities, Inc., 841 F.2d 527, 530 (4th Cir.1988) (involving former 45-day limit for § 547(c) ordinary course of business exception to preference law). Champion, however, overlooks the critical fact that in each of those cases, the check at issue had been honored when presented for payment. When a check bounces, the date of delivery of the dishonored check no longer determines the time of transfer for the purpose of § 547(b). See In re White River Corp., 799 F.2d 631, 634 (10th Cir.1986); In re Global Int'l Airways Corp., 80 B.R. 990, 995 (Bankr.W.D.Mo.1987). The basic rationale for the date of delivery approach is that "in the commercial arena, for most purposes, payment by check is the end of a commercial transaction." Virginia Information Systems, 932 F.2d at 342. The delivery of a bounced check, however, can in no way be deemed the end of a commercial transaction. Indeed, the transfers in this case which ended the transaction were the wire transfers which clearly took place within the ninety-day preference period.
 
 
 9
 To accept Champion's position that the date of delivery of the dishonored check should determine the time of transfer would have the anomalous effect of giving operative legal significance to bad checks. It would also undermine both of Congress' purposes for § 547(b). First, favoritism of certain creditors with payments making good the bad checks deals a serious blow to the fundamental bankruptcy policy of equality of distribution among members of the same class by enabling some unsecured creditors to receive more than their pro rata share of assets in the estate. Second, creditors may possess greater incentives to forsake cooperative arrangements involving financially troubled debtors if the delivery date of dishonored checks is to become the operative one under bankruptcy preference law. With the insufficiency of funds in a debtor's account less of an immediate constraint, creditors may be tempted to demand payment from a debtor on the edge of bankruptcy rather than negotiate a work-out plan on the grounds that even a bad check might later be made good without risking avoidance of the payment as a preference. Thus, we conclude that the district court was correct in refusing to relate the time of the wire transfers back to the date the bad check was delivered.
 
 B.
 
 10
 We may quickly dismiss Champion's remaining arguments that the elements of an avoidable preference were not met. Champion argues on appeal that the wire transfers did not represent an interest of the debtor in property because the proceeds from the sale of the mobile homes constitute property held in trust for Champion by D & M. This argument was not raised at the trial level, has no relevant legal authority in support of it, and overlooks the fact that this is nothing more than a traditional debtor-creditor relationship in which the indicia of a trust are not present.
 
 
 11
 We also find no basis for overturning the district court's conclusion that the payments represented by the wire transfers were for or on account of antecedent debts. While Champion cites White River for the proposition that a debt is not incurred until it becomes "due and payable," 799 F.2d at 633, we focus on that same court's underlying recognition that "a debt is incurred when a debtor first becomes legally bound to pay." Id. at 632 (citing In re Iowa Premium Service Co., 695 F.2d 1109, 1111 (8th Cir.1982) (en banc); Barash v. Public Finance Corp., 658 F.2d 504, 512 (7th Cir.1981)). In this case, the Security Agreement between the parties states that D & M undertook a legal obligation to repay Champion each time it accepted an advance for the purchase of a mobile home. The fact that D & M typically did not repay an advance until it sold the relevant mobile home in no way calls into question the conclusion that the transfers here were on account of antecedent debts.
 
 
 12
 Champion also contends that the courts below erred in concluding that Champion received more as a result of the wire transfers than it would have under the liquidation provisions of the Code. No one disputes that if Champion were an unsecured creditor, it would not have been paid in full in liquidation. While Champion is certainly correct that a payment to a properly perfected secured creditor within the ninety-day period is not generally a preference because it does not deplete the bankruptcy estate, that is not the situation we confront here. In this case, Champion voluntarily released its security interest in the five mobile homes when it released the certificates of origin. Given our aforementioned unwillingness to relate the time of the wire transfers back to the delivery date of the bad check, it is clear that Champion was an unsecured creditor when the wire transfers were made and that Champion received more than it would have as an ordinary unsecured creditor. Thus, we conclude that the district and bankruptcy courts did not err in holding that all elements of a § 547(b) preference had been met.
 
 III.
 
 13
 The Bankruptcy Code provides several exceptions to the trustee's power to avoid transfers that otherwise qualify as preferences, see 11 U.S.C. § 547(c), and Champion argues that the courts below erred in refusing to apply two of the exceptions to this case. First, Champion contends that the wire transfers were a contemporaneous exchange for new value given to the debtor. Id. § 547(c)(1). Second, Champion argues that these transfers were made in the ordinary course of business between it and D & M. Id. § 547(c)(2). We find no error in the rejection of these exceptions.
 
 A.
 
 14
 In order for a creditor to successfully make out the first defense, the creditor must prove both that the transfer was intended by the debtor and the creditor to be a contemporaneous exchange for new value and that in fact the transfer was a substantially contemporaneous exchange. Id. §§ 547(c)(1), 547(g). In this case, Champion argues that the release of its security interest in the mobile homes in exchange for D & M's bad check constituted a contemporaneous exchange for new value. The only payments, however, ever given to Champion were the wire transfers, which were within the preference period, and those payments can hardly be seen as contemporaneous with Champion's release of the certificates of origin outside that same period. Indeed, to relate the wire transfers back to the time of the certificates' release in order to make the exchange contemporaneous is to accord the very operative legal significance to bad checks that we have rejected in the preceding section.
 
 
 15
 Further, when a bounced check is given by the debtor in exchange for new value provided by a creditor, any subsequent payment to make good the bad check is not a contemporaneous exchange for new value. See In re Standard Food Services, Inc., 723 F.2d 820, 821 (11th Cir.1984) (cashier's check making good a bounced check held not a contemporaneous exchange for new value). While we recognize that checks given by the debtor in exchange for new value are ordinarily "intended to be contemporaneous" and are "in fact substantially contemporaneous," see H.R.Rep. No. 595, supra, at 373, reprinted in 1978 U.S.C.C.A.N. at 6329; S.Rep. No. 989, 95th Cong., 2d Sess. 88, reprinted in 1978 U.S.C.C.A.N. 5787, 5874 (identical language in each), the bill's sponsors in both houses made plain that this equivalence of checks with cash payments does not apply when "the check is dishonored." 124 Cong.Rec. H11,097 (daily ed. Sept. 28, 1978); 124 Cong.Rec. S17,414 (daily ed. Oct. 6, 1978) (identical language in each).
 
 
 16
 The reason why an exchange involving a dishonored check is outside this exception to the avoidance power is clear. The exception for a contemporaneous exchange does not ordinarily apply to credit transactions, and the dishonor of a check inevitably creates an antecedent debt owed by the debtor which any subsequent payments to make good the check, no matter how quickly made, would be satisfying. See Standard Food Services, 723 F.2d at 821; 2 Collier's Bankruptcy Manual p 547.10 (3d ed.1991) ("If the check is dishonored, however, the transfer would not in fact be substantially contemporaneous and, thus, would not be protected under this exception"). Unlike the case of an honored check or a cash payment where there is only one exchange between the debtor and creditor, the case of a dishonored check involves multiple exchanges and thus assumes the character of a credit transaction: the debtor gives the bad check, which in this context is the functional equivalent of a promissory note, followed by one or more payments to make good the check. The dishonor of a check, therefore, defeats the actual achievement of a contemporaneous exchange for new value, and we conclude that any payments to make good a bounced check cannot qualify as transfers to which the contemporaneous exchange exception applies.*
 
 B.
 
 17
 Champion also alleges that the ordinary course of business exception negates the avoidability of the wire transfers by the trustee. In order to prove this defense, the creditor must show that the transfer was
 
 
 18
 (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
 
 
 19
 (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
 
 
 20
 (C) made according to ordinary business terms.
 
 
 21
 11 U.S.C. § 547(c)(2). Focusing on the second requirement, the courts below held that Champion had not met its burden in proving the applicability of this exception. Because this is a factual determination made by the court, we may set aside the bankruptcy judge's findings on this point only if we judge them to be clearly erroneous. In re Yurika Foods Corp., 888 F.2d 42, 45 (6th Cir.1989).
 
 
 22
 Champion argues that the ordinary course of affairs between it and D & M entailed Champion's release of certificates of origin upon receipt of a check from D & M. Champion believes that for purposes of this exception, the court should not in any way distinguish the receipt of the bad check in this case from Champion's receipt of good checks from D & M on all prior occasions. Champion also suggests that the wire transfers should not be the focus of the "ordinary course" inquiry given that they simply represented a delayed honoring of the check.
 
 
 23
 We reject Champion's contention that the trial court erred in finding this situation outside the ordinary course. We do not believe that Congress intended a bad check and subsequent payments to make it good to be viewed as in the ordinary course of affairs between two parties or made according to ordinary business terms. The purpose of the ordinary course exception is to "leave undisturbed normal financial relations" which do not entail any "unusual action" taken by either the debtor or the creditor. H.R.Rep. No. 595, supra, at 373, reprinted in 1978 U.S.C.C.A.N. at 6329; S.Rep. No. 989, supra, at 88 (1978), reprinted in 1978 U.S.C.C.A.N. at 5874 (identical language in both reports). Quite apart from the fact that the bankruptcy court found that "the dishonoring of the check was a deviation from the ordinary course of business between the parties" and that the subsequent wire transfers represented an uncustomary medium of payment, to allow parties to benefit from writing or receiving bad checks would almost certainly result in a greater number of such checks being passed. One can hardly imagine anything that would be more disruptive of "normal financial relations" between troubled debtors and their creditors than affording dishonored checks the imprimatur of law.
 
 IV.
 
 24
 As a final basis for reversal, Champion argues that the equities of the situation demand that it be allowed to retain the payments made by wire transfer. As the basis of its plea for equity, Champion contends that it had no way of knowing that D & M was in any sort of financial trouble and that the parties intended the wire transfers to replace the bounced check. Champion also suggests that it was "powerless to protect itself" from the actions of D & M which resulted in its loss of its security interest. Thus, Champion believes that treating it as an unsecured creditor would be a triumph of form over substance which would defeat the parties' intent.
 
 
 25
 While we agree that Champion's position is unfortunate, we believe it is mandated under law. The avoidance of every preference will to some extent defeat the intent of the parties because the transferor was willing to make the transfer and the transferee was presumably willing to accept it. Moreover, to adopt Champion's position would require this or some other court to make a judgment on the following questions: (1) Champion's knowledge of D & M's financial troubles; (2) the reasonableness of Champion's belief that the check was good; (3) the intent of the parties in making the wire transfers; and (4) whether the wire transfers were made within a reasonable time after the check bounced. The problem with this approach is that it runs directly counter to the intent of the drafters of the preference provisions to eliminate these litigious inquiries in favor of a clear application of objective criteria. Making dispositive the factors of reasonableness and intent impedes the primary bankruptcy policy of equality of distribution among creditors by sanctioning the very preferences that Congress sought to disallow, see H.R.Rep. No. 595, supra, at 178, reprinted in 1978 U.S.C.C.A.N. at 6139, and such factors are generally not germane under § 547(b). See Barash, 658 F.2d at 510; 2 Collier's Bankruptcy Manual, supra, at p 547.01. All of the objective criteria of § 547(b) have been satisfied in this case, and we simply have no authority to limit or expand the plain language of the statute.
 
 
 26
 Champion's contention that it was powerless to prevent the loss of its security interest is simply incorrect. The facts of the case reveal that Champion voluntarily released its security interest without waiting to see if D & M's check cleared. A Champion account manager testified at the bankruptcy court's hearing on the matter that it was Champion's frequent practice to confirm funds in a debtor's checking account before releasing certificates of origin if the debtor had a history of sending bad checks. As the bankruptcy court stated, "Champion ... is a sophisticated commercial lender which certainly understands the consequences of releasing collateral in reliance upon payment by check." In this case, Champion took a legal risk by releasing its security interest before being assured of payment, and regrettably it must now accept the legal consequences.
 
 V.
 
 27
 We thus hold that the prior receipt of a bad check cannot provide the basis for allowing an unsecured creditor to escape the reach of a trustee's avoidance powers. In cases where all of the objective criteria of § 547(b) are otherwise satisfied, a transfer is an avoidable preference when it is made by a debtor to an unsecured creditor within the preference period and is designed to make good a dishonored check which was delivered to the creditor before the ninety-day period. This holding does nothing more than apply to such transfers the plain language of 11 U.S.C. § 547(b). It will serve to reduce uncertainty in this area of preference law by removing the need for case-specific examination of dishonored checks made good within a preference period. Finally, the rule will serve notice to secured creditors to retain their security interests until payment is assured in order to alleviate possible preference problems.
 
 
 28
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 WIDENER, Circuit Judge, concurring:
 
 29
 I concur in the result and, in large part, in the opinion of the court. However, I would add the following:
 
 
 30
 I do not concur in the opinion as it refers, on pages 798 and 799 thereof, to the presence or absence of "operative legal significance" given "to bad checks." I think it apparent, even by our decision, that bad checks may and frequently do have operative legal significance, not that sought for in this case by Champion, however. I would not rely on that as a reason for our decision.
 
 
 31
 I concur in Part III(B) of the opinion, not for the reason that the courts below were not clearly erroneous in their holdings that the events which took place here were not in the ordinary course of business or financial affairs, but because, as it recites, that "[w]e do not believe that Congress intended a bad check and subsequent payments to make it good to be viewed as in the ordinary course of affairs between two parties or made according to ordinary business terms." Also, as our opinion recites, I think making a bad check good must be considered "unusual action," thus taking such a transaction out of the ordinary course of business or financial affairs of the parties. To rely on the factual determination of the courts below in the circumstances present here may suggest that if the parties had gone through like factual situations on previous occasions in making bad checks good, a finding of ordinary course of business or financial affairs might have been sustained. I do not think that is the case.
 
 
 
 *
 Because we rest our decision upon the absence of substantial contemporaneity, we need not reach the question whether the release of the certificates in this case constituted new value given by the creditor