**In re OLD ELECTRALLOY CORPORA-TION F/K/A and F/D/B/A Electralloy Corporation, Debtor.**

**Richard W. ROEDER, Trustee, Plaintiff,**

v.

**CLIMAX MOLYBDENUM COMPANY, Defendant.**

Bankruptcy No. 91–00062E.

Adv. No. 93–1026.

United States Bankruptcy Court, W.D. Pennsylvania.

March 7, 1994.

Mark G. Claypool, Erie, PA, for trustee.

Richard O. Austermann, Norwalk, CT, for defendant.

### OPINION

WARREN W. BENTZ, Bankruptcy Judge.

#### Introduction

Old Electralloy Corporation f/k/a and f/d/b/a Electralloy Corporation ("Debtor") filed its voluntary Petition under Chapter 7 of the Bankruptcy Code on January 29, 1991 ("Filing Date"). Richard W. Roeder, Esq. ("Trustee") serves as Chapter 7 Trustee. The Trustee filed the within Complaint against Climax Molybdenum Company ("Climax") to recover $26,000 under the preference provisions of 11 U.S.C. § 547. The Trustee asserts that the Debtor transferred $26,000 to Climax within 90 days of the Filing Date on account of an antecedent debt while the Debtor was insolvent and that the payment enabled Climax to receive more than it would receive as a distribution in this Chapter 7 case.

Climax asserts as defenses that the transfer was a contemporaneous exchange for new value; that as a result of the transfer, Climax gave new value to the Debtor; that the transfer was made in the ordinary course of business between the Debtor and Climax and made according to ordinary business terms; and that the Trustee's claims are subject to setoff against Climax's claims against the bankruptcy estate. Climax also asserts that the Trustee has failed to assert the existence of any evidence that the funds were property of the Debtor and to prove that the Debtor was insolvent at the time of the transaction or that the transfer enabled Climax to receive more than it would receive under Chapter 7. Discovery has been completed, pre-

trial statements with exhibits to be used at trial have been filed and a pretrial conference has been conducted. We find that the matter is ripe for decision without further proceedings.

*Facts*

From pretrial statements and the exhibits thereto, and the remainder of the record, we derive the following facts. The Debtor and Climax commenced a business relationship in 1988. Effective as of March 30, 1988, Climax granted the Debtor a credit line of $50,000. Because of concerns over the Debtor's deteriorating financial condition, Climax withdrew the credit line on June 13, 1990 and required all further shipments to the Debtor be delivered on a cash or letter of credit basis.

On July 24, 1990, Robert F. Toma, a sales manager for Climax contacted Rod Neff, the Debtor's purchasing manager and obtained a blanket order to supply materials to the Debtor for the second half of 1990. Climax reopened a line of credit for the Debtor with a $30,000 limit. The terms of payment for shipments made under the blanket order were a 30-day consignment with Climax invoicing the Debtor 30 days after shipment and the invoice being due 30 days from the invoice date.

Climax shipped the first order valued at $26,000 on August 1, 1990 and invoiced the Debtor for the first shipment on September 1, 1990. A second shipment also valued at $26,000 was made on September 5, 1990. The second shipment was invoiced on October 5, 1990. Similarly, a third shipment valued at $26,000 was made on September 21, 1990 and was invoiced on October 24, 1990 and a fourth shipment valued at $26,000 was shipped on October 19 and invoiced on November 19, 1990. A fifth shipment valued at $3,086.10, an order placed separately from the "blanket order" and not falling under the consignment arrangement, was shipped on October 18, 1990 and invoiced on October 19, 1990. At this point, the Debtor had made no payment and owed Climax $107,086.10, well in excess of the fixed credit limit of $30,000.

The Debtor then placed a further order valued at $15,600 on November 2, 1990 which the Debtor picked up at Climax's premises on November 12, 1990. *See Bill of Lading* dated November 12, 1990. On that same date, the Debtor issued its check number 12439 in the amount of $26,000. The stub prepared by the Debtor accompanying check number 12439 is marked "COD." The Debtor delivered the check when it picked up the shipment. Climax applied the payment to the initial $26,000 order. On November 20, 1990, the Debtor's bank returned the check to Climax for reason of insufficient funds. Climax placed a hold on the Debtor's account.

Sometime between December 3 and December 11, Climax received Debtor's check number 12669 for $26,000 as a replacement for the bounced check. Check number 12669 cleared the Debtor's bank in the normal course. After check number 12669 was paid, the Debtor owed Climax a remaining balance of $96,686.10.

Climax attempted, without success, to obtain further payment from the Debtor. On December 22, 1990, Climax redeposited the Debtor's bounced check (number 12439) which was returned shortly thereafter marked "stopped payment."

The Debtor's bankruptcy filing followed on January 29, 1991. Climax timely filed proof of claim number 110 asserting a claim in the amount of $96,686.10. The Trustee filed an objection to the claim on the basis that Climax had not sufficiently documented the amount claimed. Climax and the Trustee subsequently agreed that the claim would be allowed in the amount of $83,252. A consent order approving the agreement was signed by the Court on May 27, 1992. The consent order was entered without prejudice to the Trustee's right to file, *inter alia*, an adversary proceeding against Climax for preferences.

The Trustee now seeks to recover as a preference the $26,000 Climax received by way of check number 12669 within 90 days of the Filing Date.

*Discussion*

*I. Preference*

11 U.S.C. § 547(b) provides that the Trustee may avoid any transfer of an interest of the Debtor in property which was made:

504

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

■ Climax asserts that the Trustee fails to meet the requirements of § 547(b) because the Trustee has failed to assert the existence of any evidence that the Debtor was insolvent at the time of the transfer and that the Trustee has not shown that the transfer enabled Climax to receive more than it would receive in this Chapter 7 proceeding.

§ 547(f) provides that the Debtor "is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." Therefore, the Trustee has no obligation to come forward with evidence to show insolvency. The presumption requires Climax to come forward with some evidence to rebut the presumption. Climax has not done so, nor could it, show that the Debtor was solvent on the date of the transfer.

Likewise, there can·be no question that allowing Climax to retain its 100% payment on its September 1, 1990 invoice enables Climax to receive more than it would receive in Chapter 7. The bulk of the assets of the estate have been liquidated. The Trustee has made a 32% distribution to general unsecured creditors with the likelihood of a much smaller future distribution.

Climax also asserts that the Trustee has failed to assert proof that the funds transferred were property of the Debtor. The check in question was drawn on and paid from the Debtor's account at Star Bank. This element of defense is without merit.

Climax does not dispute that the remaining elements under § 547(b) have been met. Accordingly, Climax received a preference in the amount of $26,000, subject to the defenses provided by § 547(c).

## II. Defenses

### A. New Value

The Trustee cannot avoid a preference under § 547(b) to the extent that the transfer was:

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;

11 U.S.C. § 547(c)(1).

The transfer in question occurred between December 3, 1990 and December 11, 1990 when the Debtor provided Climax a replacement check for the bounced check which the Debtor had tendered to Climax on November 12, 1990.

■ Had the original November 12, 1990 check cleared the Debtor's bank, there would have been an exchange for new value, at least to the extent of $15,600, the amount of goods transferred to the Debtor on the same date. The date of the transfer in question, however, is the date of delivery of the replacement check. *See In re So Good Potato Chip Co.,* 137 B.R. 330 (Bankr.E.D.Mo.1992); *In re St. Louis Globe Democrat Inc.,* 99 B.R. 946 (Bankr.E.D.Mo.1989); *In re Fasano/Harriss Pie Co.,* 43 B.R. 871 (Bankr. W.D.Mich.1984) *aff'd* 71 B.R. 287 (W.D.Mich. 1987). On that date, there was no exchange for new materials, but rather an exchange of a new check for the bounced check. A subsequent payment to make good a bad check is not a contemporaneous exchange for new

value. *In re Barefoot,* 952 F.2d 795, 800 (4th Cir.1991).

■ § 547(a)(2) defines "new value" as "money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee ..." Any possible criminal liability which may have been given up by Climax when it accepted the replacement check does not constitute new value as defined by § 547(a)(2). *In re St. Louis Globe Democrat, Inc.,* 99 B.R. at 949.

The replacement check represented satisfaction of a preexisting debt. Climax gave no new value contemporaneous with or subsequent to the date of the replacement check. Thus, the new value exception does not apply.

### B. Ordinary Course of Business

The Trustee cannot avoid a preference under § 547(b) to the extent that the transfer was:

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms;

11 U.S.C. § 547(c)(2).

■ "The purpose of the ordinary course exception is to 'leave undisturbed normal financial relations' which do not entail any 'unusual action' taken by either the debtor or the creditor." *In re Barefoot,* 952 F.2d at 801 *quoting* H.R.Rep. No. 595, 95th Cong., 2d Sess. 373 (1978), *reprinted in* 1978 *U.S.Code Cong. & Admin.News,* 5963, 6329; S.Rep. No. 989, 95th Cong.2d Sess. 88 (1978), *reprinted in* 1978 *U.S.Code Cong. & Admin.News,* 5787, 5874 (identical language in both reports). "One can hardly imagine anything that would be more disruptive of 'normal financial relations' between troubled debtors and their creditors than affording dishonored checks the imprimatur of law," *Barefoot at 801.*

Here, there is no suggestion that the Debtor routinely or for that matter, that the Debtor ever previously tendered a bad check to Climax. There is also no suggestion that it was the Debtor's normal course to pay its creditors with bad checks and later redeem them with replacement checks.

There being no history between the Debtor and Climax or the Debtor and its other creditors operating in this fashion, the payment made to Climax via a replacement check is outside the ordinary course of business.

At first blush, it may seem inequitable to allow the Trustee to recover $26,000 and to require Climax to accept a dividend as an unsecured creditor. However, the purpose of a Chapter 7 liquidation is to provide an equitable distribution to all creditors. Without this recovery, Climax receives a 100% distribution on one of its invoices, while other creditors receive only a percentage. Climax was aware of the Debtor's precarious financial condition. It had previously cut off the Debtor's credit line. When the credit line was reopened, it was limited to $30,000, yet Climax extended credit far in excess of that amount. When the Debtor's balance exceeded the limit, Climax agreed to accept checks on delivery and even then, provided materials to the Debtor without payment. Finally, on the final shipment Climax did accept a check on delivery which bounced. The acceptance of a check is nothing more than a further extension of credit until the check clears. Climax could have prevented the present situation by monitoring its credit procedures and by requiring the Debtor to pay for shipments with cash, a cashier's check or certified funds.

### C. Setoff

Climax asserts that the Trustee's claims "are subject to setoff in whole or in part by virtue of [Climax's] status as an unpaid creditor of the bankrupt estate."

■ Generally, a creditor cannot setoff his claims against his obligation to return a preference. *In re Chase & Sanborn Corp.,* 124 B.R. 371 (Bankr.S.D.Fla.1991); 4 *Collier on Bankruptcy,* ¶ 553.09 at 553–55–57.

There is a limited exception "where the preferred creditor is entitled to receive a dividend, the dividend can be quickly and easily determined, and the dividend is immediately payable." *In re Gander Mountain, Inc.*, 29 B.R. 260 (Bankr.E.D.Wis.1983).

Climax and the Trustee previously agreed that Climax holds a general unsecured claim in the amount of $83,252. The Trustee has made an interim distribution of 32% on general unsecured claims. Climax previously received a distribution of $26,640.64 on its claim amount of $83,252. The return of the preference to the estate in the amount of $26,000 gives rise to an additional unsecured claim in that amount which entitles Climax to an additional distribution of $8,320. Climax will be permitted to deduct, or setoff, the amount of the distribution it is entitled to receive as a dividend from the estate from the amount of the preference it is required to pay back. Accordingly, Climax will be ordered to return $17,680 ($26,000 − 8,320) to the estate. Climax will receive its prorata share of any future distribution on its total claim of $109,252 ($83,252 + 26,000).