**In re LAKE PROVIDENCE PROPERTIES, INC.,**
**Debtor.**

**PAVING EQUIPMENT OF CAROLINA, INC., d/b/a Mecklenburg Paving, Inc., Plaintiff,**

v.

**LAKE PROVIDENCE PROPERTIES, INC. and James E. Wall, Sr., Trustee, Defendants.**

**No. 3:93CV345–P.**

United States District Court, W.D. North Carolina, Charlotte Division.

May 25, 1994.

William G. Robinson, Charlotte, NC, for plaintiff.

Robert L. Lindsey, Jr., Charlotte, NC, for defendant/debtor Lake Providence Properties, Inc.

J. Craig Whitley, Charlotte, NC, for defendant James E. Wall, Trustee.

## ORDER

ROBERT D. POTTER, District Judge.

**THIS MATTER** is before the Court on appeal by Lake Providence Properties, Inc. and James E. Wall, Trustee (Appellants or LPP) from an order in which United States Bankruptcy Court Judge George R. Hodges made findings of fact and conclusions of law filed September 28, 1993, stemming from a bench trial conducted in an adversary proceeding action in which Appellee made claims against Appellants' Chapter 11 bankruptcy estate. On October 7, 1993, Appellants filed notice of appeal and on February 7, 1994, Appellants filed their opening brief in support of this appeal. Appellee (or Mecklenburg Paving) responded in a brief filed March 8, 1994. Appellants replied in a brief filed March 21, 1994.

The Court has conducted a careful and thorough *de novo* review of the legal conclusions rendered by the Bankruptcy Court and has conducted a similar review of that Court's factual findings. Having reviewed this appeal, the Court concludes no reversible error is presented. The Court finds no clear error in Judge Hodges's findings of fact. Further, while the Court will affirm the Bankruptcy Court's decision, it will do so on slightly different grounds. *In re Barefoot,* 952 F.2d 795, 800–01 (4th Cir.1991); *In re Knightsbridge Development Co.,* 884 F.2d 145, 147 n. 3 (4th Cir.1989) (*de novo* standard applies to legal conclusions). In sum, the Court affirms the Bankruptcy Court's September 28, 1993 order for the reasons set forth *infra.*

## FACTUAL SUMMARY

Neither party to this appeal finds error in nor objects to the Bankruptcy Court's findings of fact. Accordingly, the Court adopts those factual findings and will set forth a brief summary of the central facts in this appeal.

This action involves Appellee's attempt to assert an equitable claim for $1,030,577.43 against Appellant Lake Providence Properties, Inc.'s Chapter 11 bankruptcy estate. The Bankruptcy Court permitted Appellee to amend its proof of claim so that it would assert an equity interest in the Appellant/Debtor. Similarly, the Appellants were permitted to verbally amend their pleadings to raise a defense under N.C.G.S. § 87–1 to the proof of claim, and to reflect the Trustee's position that Appellant's claims were in the nature of equity, not debt.

LPP is a real estate development company that was, beginning in the Fall of 1991 until sometime in late 1992, developing three subdivisions known as Lake Providence North, Providence Hills, and Valley Ranch. In the fall of 1991, LPP's President and sole shareholder, William Nolan, approached Mecklenburg Paving's President, Robert Yon, about completing the infrastructure work at Providence Hills. Nolan and Yon entered into a relationship in which Mecklenburg Paving (who is admittedly not licensed as a general contractor) would develop the land provided by LPP and the two companies would split the proceeds of the lot sales. In anticipation of a contract, these companies executed a Memorandum of Understanding dated October 25, 1991, which was not a contract, detailing the terms of this relationship. In furtherance of this relationship, Mecklenburg Paving coordinated, managed, and sometimes itself performed with its own equipment the land development.

Not long after inaugurating this relationship, Mecklenburg Paving undertook, at LPP's request, to construct a dam for a lake at Lake Providence North. LPP made the request because of a continuing dispute with the Lake Providence North Landowners concerning LPP's failure to complete a lake it assured them it would develop. At this time, Mr. Nolan was in something of a bind because he had signed a Consent Judgment in favor of the lot owners in which he promised to complete this lake. Failure to complete the lake would have resulted in Nolan being

jailed for contempt of court. To address this predicament, an addendum to the Memorandum of Understanding (the Explanation Concerning Memorandum of Understanding dated November 21, 1991) provided that Mecklenburg Paving would do this work for not more than $65,000, with no money down.

Eventually, the parties entered into a Joint Venture Agreement which provided that Mecklenburg Paving would complete development at both projects at its expense in exchange for LPP's promise to provide the land, sell the lots, and from those sales pay Mecklenburg Paving $1,680,750.00 in installments of $20,497.00 per lot sold. That is, Mecklenburg would take a portion of the profits from lot sales. This agreement was secured by a Note dated March 3, 1992 and a Deed of Trust on the Providence Hills subdivision. However, the relationship between LPP and Mecklenburg Paving went beyond their joint venture and included loans from Yon to Nolan, and work performed on projects other than Providence Hills and the lake.

The relationship degenerated and through the course of the months to follow, both companies experienced considerable financial difficulties resulting from their failing joint venture. In November of 1992, Nolan told Dan Martin, an LPP employee, that if Mecklenburg Paving defaulted on its duties in the Joint Venture Agreement, he would benefit in the amount of $250,000 by avoiding his obligation to pay Mecklenburg Paving. Other evidence indicated Nolan was attempting to force Mecklenburg Paving to default and thereby afford LPP with the work already completed for free. After Yon refused to subordinate liens he had on the projects to enable Nolan to have some cash for living expenses, Nolan directed Yon to get off the jobs. Yon obliged Nolan and left his work on the developments. LPP filed for Chapter 11 protection on January 14, 1993. This adversary proceeding followed soon thereafter.

### ANALYSIS

■ The Bankruptcy Court decided to allow $1,016,377.02 of Mecklenburg Paving's claim as a secured equity interest in Provi-

dence Hills subdivision superior to Nolan's and Appellant's but subordinate to all other claims. The Court affirms this decision.

Appellant claims the Bankruptcy Court erred as a matter of law in allowing Appellee's equity claim over its own. Specifically, Appellant contends Appellee is precluded from having this claim by N.C.G.S. § 87–1 which has been held by North Carolina courts to prevent unlicensed general contractors from recovering for work under either breach of contract or quantum meruit theories.

■ N.C.G.S. § 87–1 provides,

any ... corporation who for a fixed price, commission or fee ... undertakes to ... construct ... on his own behalf or for any person ... the construction of any building .. grading or any improvement or structure where the cost of the undertaking is forty-five thousand dollars ... shall be deemed to be a "general contractor".... in the State of North Carolina. N.C.G.S. § 87–1.

Nothing in the plain wording of this statute operates to prevent unlicensed general contractors from collecting payment for the work they have provided for others. Instead, the North Carolina courts have inferred from this statute, as a matter of contract law illegality doctrine, the voidability of contracts entered into by unlicensed contractors. So, Appellant's heavy reliance on the strict construction of this statute to avoid finding an exception for partnerships is, to say the least, misbegotten. If anything, this argument cuts the other way for Appellant and favors the Appellee. North Carolina's courts have unambiguously said,

When, in disregard of such a protective statute, an unlicensed person contracts with an owner to erect a building costing more than the minimum sum specified in the statute, he may not recover for the owner's breach of that contract. This is true even though the statute does not expressly forbid such suits. *Vogel v. Reed Supply Company*, 277 N.C. 119, 177 S.E.2d 273, 280 (1970) (emphasis added).[1]

According to North Carolina law,

1. This doctrine also applies to recovery in the

same circumstances under a quantum meruit

[t]he failure of a general contractor to be licensed does not render 'void' the contract between the contractor and the owner. The nature of the transaction is still extant, with the proviso that in an action brought against the owner by the general contractor, the owner may assert against the general contractor the affirmative defense of failure to be properly licensed. *Zickgraf Enterprises, Inc. v. Yonce*, 63 N.C.App. 166, 303 S.E.2d 852, 853 (1983). The reason behind this rule is that it "fulfills the purpose of the licensing statute which is the protection of the public against incompetent builders." *Id.* Yet, it is also recognized by those courts that "[t]he licensing statutes should not be used as a shield to avoid a just obligation owed to an innocent party." *Id.* Consequently, North Carolina law recognizes that the rule does not apply universally, for example, when a subcontractor seeks to enforce a valid lien against an unlicensed general contractor arising out of a "valid contract between an unlicensed general contractor and a property owner." *Id.* 303 S.E.2d at 854. This is so, in part, because the subcontractor is in a different sort of relationship with the unlicensed contractor.

■ The rule, therefore, is not such a blunt instrument and is not so talismanic that it voids all relationships, contractual or otherwise, entered into by unlicensed general contractors and other persons. The scope of the rule is limited to contracts between unlicensed general contractors and owners who are the object of this rule's protective purposes. The rule was intended to protect an otherwise unprotected public, not to provide an occasion for developers to obtain free general contracting services from unlicensed partners.

The rule inferred from § 87–1 was manifestly announced to protect unsuspecting property owners from "incompetent builders"

*Zickgraf*, 303 S.E.2d at 853, because "[t]he public is protected by testing the competency of the general contractor through licensing." *Mill–Power Supply*, 355 S.E.2d at 248. Consequently, the rule gives powerful incentive to general contractors to have and maintain their licenses. This rule does not operate so sweepingly as to divest an unlicensed general contractor of all its assets, and certainly not those assets which the Bankruptcy Court found Mecklenburg Paving had in a partnership with LPP. The mere fact that Mecklenburg Paving had no license to operate as a general contractor did not cause its partnership assets, created partially by its labor, to evaporate.

■ There can be no doubt that Mecklenburg Paving was not suing LPP for either breach of contract or quantum meruit in the Bankruptcy Court; particularly in light of its amended proof of claim which the Bankruptcy Court permitted and which was brought as "an equity interest in the Debtor instead." *Findings of Fact and Conclusions of Law*, p. 3. There can also be no doubt that the rule against unlicensed contractors applies only within the context of actions for breach of a contract between such a contractor and an owner for general contracting services. But the parties here did much more than contract for general contracting services.

According to the Bankruptcy Court, "obligations between Mecklenburg Paving and LPP are in the nature of a joint venture, essentially, a partnership between the Debtor and Mecklenburg Paving." *Id.* at p. 12 ¶ 1. The claim before the Bankruptcy Court was an equity interest in a partnership between LPP and Mecklenburg Paving. That equity interest was created by a combination of LPP's land and services, and Mecklenburg Paving's services and some of its money in the form of loans. Mecklenburg Paving's

theory. *Mill–Power Supply Co. v. CVM Associates*, 85 N.C.App. 455, 355 S.E.2d 245, 247 (1987). It bears mentioning that Appellant's fears of a judicial activist deviation from the text of this statute is misplaced. The statute itself nowhere hints at the doctrine inferred from it by North Carolina's courts. North Carolina courts, well within their province as courts of the common law, have already gone beyond the statute. Simply said, the fact that North Carolina's

courts, on their own initiative, have inferred a doctrine not expressly provided for by the North Carolina legislature in the text of this statute does not counsel, or even hint, that the same should be done in this particular case by a federal court. So, it is simply not deviation from the statute that is implicated in this case but whether the doctrines inferred from it apply here or whether this Court should fashion its own new doctrine out of something other than the statute.

capital contributions were no less real because they took the form of services rendered; albeit without a license. Because the Court knows of no North Carolina case law which holds that a member of a partnership is dispossessed of its partnership assets because it did not have the license required by § 87–1, and because the Court can see no logically compelling reason to so hold, it is unprepared to do so for the courts of North Carolina.

There are a number of reasons to support this conclusion. First, an agreement to establish a partnership is meaningfully distinguishable from a mere agreement to provide general contracting services. The facts of this case are illustrative. In addition to providing its grading services, Mecklenburg Paving's President, Mr. Yon, also contributed money to the dam engineer for his services, loaned Nolan money to pay his living expenses, sought out alternative financing when the partnership's cash flow became constricted, forgave of debt between the partners, and agreed to accelerate the progress of a project to keep a partner out of jail at the expense of other paying jobs. Moreover, Mecklenburg Paving's payment was contingent upon the success of the partnership's enterprise, not exclusively on his performance of a promise.

■ It is already recognized that North Carolina's courts "will not impose penalties for the failure to comply with a licensing requirements in addition to those specifically set out in the statute." *Zickgraf,* 303 S.E.2d at 835. The statute plainly prohibits unlicensed general contractors "for a fixed price, commission, fee or wage . . ." from undertaking to furnish general contracting services. It is intended to prevent property owners from being exploited by unqualified general contractors in a contractual setting. It is not intended to prevent unlicensed general contractors from creating partnership relationships and contributing to the partnership with their sweat equity. The remedy for a person entering into direct agreements with an unlicensed contractor is found in the illegality doctrines articulated in North Carolina contract law. The remedies for one forming a partnership with an unlicensed contractor is to be had in the law of partnership, not the law of contract. The Court will not append § 87–1 to the law of partnership in North Carolina.

■ Second, that this rule should extend from contract cases to partnership arrangements is not at all obvious. Partnership law affords those who may be damaged by unlicensed contractors with remedies not available in the law of contracts. Particularly important are the fiduciary duties owed by one partner to the other. The Court cannot see how Appellee has breached any fiduciary duty owed to Appellant, and even if it had, there does not appear in the record to be the slightest injury resulting from it. In this case, the Court cannot see how Appellee has breached a fiduciary duty owed to its partner. Moreover it does not appear that the present unlicensed general contractor's status posed a threat to a hapless and unsuspecting land developer.

Appellant points out that "being a partner does not excuse compliance with the general contractor licensing statute." But, accepting this truism does not lead the Court inevitably to conclude that failure to comply with the licensing statute destroys a partner's equity interest in a joint venture in which his capital contribution takes the form of construction and other services.

The text of § 87–1 says nothing about its effect on the equity interest obtained by an unlicensed contractor in a partnership involving much more than a mere contract for general contracting services and the Court believes it would be improvident for it to announce a rule that neither the General Assembly nor the courts of North Carolina have seen fit to proclaim. Consequently, assuming, without deciding, that Mecklenburg Paving was acting as a general contractor, it is not the case that his partnership interest has been rendered void in law or equity because he was unlicensed in contravention of § 87–1.

■ The Court believes the Bankruptcy Court did not err as a matter of law in refusing to extend the doctrine implied from § 87–1 to the partnership relationship. Similarly, the Court does not believe the Bank-

882

ruptcy Court abused its discretion as a court of equity in finding Mecklenburg Paving's claim was entitled to a superior status to that of LPP. Accordingly, the Court affirms the Bankruptcy Court's decision to attach superiority to Appellee's equity claims over those of LPP.

Finally, the Court does not believe the Bankruptcy Court's findings of fact to support its conclusions about the amount of the claim it would allow were either insufficiently supported or made in clear error. In fact, the Court believes the Bankruptcy Court carefully scrutinized the testimony before it, which was adequate, to determine the amount of claim it should allow in its equitable powers to administer the Chapter 11 estate.

**NOW, THEREFORE, IT IS ORDERED** that the Bankruptcy Court's decision be, and hereby is **AFFIRMED.**

**IT IS FURTHER ORDERED** that this appeal be, and hereby is, **DISMISSED.**