**In re CYBERREBATE.COM, INC., Debtor.**

**Official Committee of Unsecured Creditors of Cyberrebate.com, Inc., Plaintiff,**

**v.**

**Gold Force International, Ltd., Defendant.**

**Bankruptcy No. 01–16534–608.**
**Adversary No. 01–1178–608.**

United States Bankruptcy Court, E.D. New York.

Aug. 7, 2003.

Vadim J. Rubenstein, Esq., Bryan Cave LLP, New York City, for Plaintiff.

Kevin J. Nash, Esq., Finkel Goldstein & Nash, LLP, New York City, for Defendant.

### DECISION AND ORDER

CARLA E. CRAIG, Bankruptcy Judge.

The Official Committee of Unsecured Creditors of Cyberrebate.com, Inc. ("plain-

tiff") initiated this adversary proceeding on behalf of Cyberrebate.com, Inc. ("debtor") pursuant to Section 547(b) of the Bankruptcy Code to recover preferential payments in the aggregate amount of $18,972.25 made by the debtor to the defendant, Gold Force International, Ltd. ("Gold Force" or "defendant"). In its answer, Gold Force does not dispute that the subject payments were preferences but asserts the affirmative defense that the payments fall within the ordinary course of business exception of § 547(c)(2) of the Bankruptcy Code.

A trial on the merits was held on April 29, 2003. After consideration of the evidence presented, including stipulated facts, this Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52, made applicable to this proceeding by Bankruptcy Rule 7052.

### Facts

The debtor filed a petition for relief under the provisions of chapter 11 on May 16, 2001 (the "Petition Date"). Prior to the bankruptcy filing, Gold Force transacted business with debtor as a supplier of jewelry items for approximately seven months, from September 2000 to May 2001. During that time, Gold Force issued invoices to the debtor, which the debtor paid within terms. Gold Force's invoices stated collection terms as either "net 30 days" or "2% 10 days."

Debtor made three separate orders for merchandise from Gold Force which gave rise to the two payments which are at issue in this adversary proceeding: (1) purchase order PO GOL120100, dated December 1, 2000 ("December 1 Purchase Order") in the amount of $1,560, (2) purchase order PO GOL121100, dated December 11, 2000 ("December 11 Purchase Order") in the amount of $15,680, and (3)

purchase order PO GOL020901, dated February 9, 2001 ("February 9 Purchase Order") in the amount of $1,620, which was shipped "Via UPS"on March 20, 2001. Gold Force issued invoice number 65381 (dated December 6, 2000) ("December 6 Invoice") in the amount of $1,580.25 in reference to the December 1 Purchase Order; invoice number 66251 (dated December 13, 2000) ("December 13 Invoice"), in the amount of $15,772 in reference to the December 11 Purchase Order; and invoice number 69902 (dated March 20, 2001) ("March 20 Invoice"), in the amount of $1,614.70, in reference to the February 9 Purchase Order; all invoices stating payment terms of "2% 10 days."

In this case, the 90–day preference period commenced February 16, 2001. During the preference period, Gold Force received two checks (the "Payments") from debtor as follows: (1) check No. 5014, in the amount of $17,352.25, which was dated March 6, 2001 and cleared on March 13, 2001 ("March 13 Payment"), representing payment for the December 6 Invoice, in the amount of $1,580.25, and the December 13 Invoice, in the amount of $15,772; and (2) check No. 5565, in the amount of $1,620.00, which was dated April 17, 2001 and cleared on April 20, 2001 ("April 20 Payment"), representing payment for the March 20 Invoice, in the amount of $1,614.70.

The parties have stipulated to the facts which establish that the Payments were preferential: (1) the Payments were made by the debtor within 90 days of the Petition Date, (2) on account of an antecedent debt, (3) at the time that the debtor was insolvent; and (4) the Payments enabled Gold Force to receive more than it would have otherwise received as a creditor in a Chapter 7 liquidation. (*See* Joint Pre-Trial Order at § 5(g), (m), (t), (u) and (v)) (the "JPTO"); 11 U.S.C. § 547(b); *In re*

*Lan Yik Foods Corp.*, 185 B.R. 103, 108 (Bankr.E.D.N.Y.1995). The only issue before this Court, therefore, is whether the Payments fall within the ordinary course of business exception of Section 547(c)(2).

### Discussion

Section 547(c)(2) of the Bankruptcy Code provides that the trustee may not avoid a transfer under subsection (b) to the extent such transfer was:

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business of the debtor's business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2).

■ According to the legislative history, "the purpose of [section 547(c)(2)] is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." H.R.Rep. No. 595, 95th Cong., 1st Sess. 373 (1977), S.R. No.989, 95th Cong., 2d Sess. 88 (1977), reprinted in 1978 U.S.Code Cong. & Admin.News, 5787, 5874, 6329. Absent such a rule, trade creditors might cease ordinary trade with any customer who appeared to be experiencing financial difficulty, thus hastening its slide into bankruptcy. *See In re Rave Communications*, 128 B.R. 369, 372 (Bankr.S.D.N.Y.1991); *see also In re Lan Yik Foods Corp.*, 185 B.R. at 110.

■ In order to defeat avoidance, the party asserting the ordinary course of business defense must establish each of the elements enumerated in section 547(c)(2). *Logan v. Basic Distrib. Corp. (In re Fred Hawes Org., Inc.)*, 957 F.2d 239, 243–245 (6th Cir.1992). The parties agree that the Payments were made by the debtor to Gold Force in payment of a debt incurred in the ordinary course of business between the debtor and Gold Force, thus meeting the requirement of subsection (c)(2)(A). What is disputed is whether the Payments were made in the ordinary course of business within the meaning of subsection (c)(2)(B) and whether they were made according to ordinary business terms within the meaning of subsection (c)(2)(C). The defendant bears the burden of proving each element of this defense by a preponderance of the evidence. *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 39 (2d Cir.1996); *see* 11 U.S.C. § 547(g).

■ Courts considering whether a transaction is in the ordinary course of business have generally focused on whether the transactions were ordinary in relation to the prior course of dealings between the particular parties. *See Yurika Foods Corp. v. United Parcel Service (In re Yurika Foods Corp.)*, 888 F.2d 42, 45 (6th Cir.1989); *In re Lan Yik Foods Corp.*, 185 B.R. at 110–111. In comparing the preferential payments with payments made prior to the preference period, several factors are examined, including: (1) the prior course of dealing between the parties; (2) the amount of the payments, (3) the timing of the payments, and (4) the circumstances surrounding the payments. *See generally In re Yurika Foods Corp.*, 888 F.2d at 45; *see also Marathon Oil Co. v. Flatau (In re Craig Oil Co.)* 785 F.2d 1563, 1567 (11th Cir.1986) ("Lateness is particularly relevant in determining whether payments should be protected by the ordinary course of business exception"). Other relevant factors include the

existence of any unusual debt collection practice and changes in the means of payment. *See Stober v. Florida Steel Corp. (In re Industrial Supply Corp.),* 109 B.R. 484 (Bankr.M.D.Fla.1990); *see also In re Craig Oil Co.,* 785 F.2d 1563.

An analysis of the chart (Debtor's Exhibit Y) summarizing the debtor's payment history with Gold Force reveals that debtor paid Gold Force's invoices, on average, within 28 days of the invoice date, whereas the March 13 Payment for both the December 1 and 11 Purchase Orders, reflected in check number 5014, in the amount of $17,352.25, was made 90 days after the invoice date (December 13, 2000) for the December 11 Purchase Order and 97 days after the invoice date (December 6, 2000) for the December 1 Purchase Order. (Debtor's Exhibit Z.) *See In re Lan Yik Foods Corp.,* 185 B.R. at 111–112 (*citing Iannacone v. Klement Sausage Co., Inc. (In re Hancock–Nelson Mercantile Co.),* 122 B.R. 1006, 1013 (Bankr.D.Minn. 1991) (noting that a "baseline of dealings" must be fixed during a time in which the debtor's operations were "ordinary" in layman's sense of the word)). The payment for the February 9 Purchase Order was made 31 days after the invoice date. (Debtor's Ex. 1.)

■ A review of courts' analyses of the timing of payments in the context of the ordinary course of business defense leads to the *conclusion that, although "a narrow band of difference is acceptable",* payments delayed more than 60 days beyond the pre-preference period average are certainly not in the ordinary course of business, pursuant to § 547(c)(2)(B). *See Huffman v. New Jersey Steel Corp. (In re Valley Steel Corporation),* 182 B.R. 728, at 737 (Bankr.W.D.Va.1995) (check payments made in the preference period approximately 67 days after the invoice dates, when compared to the average in the pre-

preference period of 54 days (a difference of 13 days), were deemed to be within an acceptable range and in the ordinary course of business, but two check payments made 119 days after invoice (representing a 65–day divergence from the pre-preference period average) were held not to be in the ordinary course of business); *see also Sprowl v. Miami Valley Broadcasting Corp. (In re Federated Marketing, Inc.),* 123 B.R. 265 (Bankr.S.D.Ohio 1991) (two check payments during preference period representing payment for a series of invoices due ranging from 79 to 101 days after invoice dates were not in ordinary course of business when compared to the pre-preference period payment history in which payments were typically made between 33 to 46 days after invoice dates); *In re CIS Corp.,* 214 B.R. 108, 120 (Bankr. S.D.N.Y.1997) (29–day discrepancy between the tardiness of pre-preference and preference payments "is not a trivial difference" and held to be outside ordinary course of business under § 547(c)(2)). However, the April 20 Payment, which payment was made within 31 days of the invoice date (March 20, 2001), shows a difference of only 3 days compared to the pre-preference period average of 28 days, and would therefore fall within a narrow range of "acceptable" difference and be protected from avoidance as being in the ordinary course of business, pursuant to § 547(c)(2)(B).

Gold Force contends that the 60–day delay should not exclude the preferential transfers at issue from the ordinary course of business exception, pursuant to § 547(c)(2), because the delay was inadvertent. According to Gold Force's Vice President, Howard Liebtag, an unnamed employee of the debtor told him, when he called in March to find out where payment for the December invoices was, that the check was written and mailed in January

2001, and was lost or mishandled (*see* JPTO, at p. 4). According to Mr. Liebtag, the March 13 Payment was received by Gold Force shortly after he called the debtor and he faxed another copy of the invoice to debtor's payables department. (*See* Gold Force's Memorandum of Law, p. 2.) Gold Force contends that the loss of a check and the issuance of a replacement check approximately 60 days later should not take the transaction out of the ordinary course of business pursuant to § 547(c)(2), as the delay in making the March 13 Payment was simply an inadvertent error, and was not intended by debtor, nor were there any "extraordinary collection efforts employed by [Gold Force]," (*Id.*, at pp. 1–6.)

This argument lacks merit for several reasons. First, the evidence does not establish that a check payment for the December Order Purchases was written in January and "lost or mishandled." To the contrary, Donald Rose, debtor's President, testified that, according to the debtor's check register, no check for the December Purchase Orders was written in December or January. (*See* Plaintiff's Memorandum of Law, p. 4.) Second, even assuming that a check was actually written and mailed in January, as Gold Force contends, the loss of this check and the issuance of the replacement check on March 6, 2001, does not make the date of the payment relate back to the original check date so as to be in the ordinary course of business. In evaluating the ordinary course of business defense, it is appropriate to consider when the payment in question was actually made. To consider instead when it would have been made if events had turned out as the debtor intended opens the door of this exception to the preference provision far too wide. *Compare In re Old Electralloy Corp.*, 164 B.R. 501 (Bankr.W.D.Pa. 1994); *In re St. Louis Globe Democrat, Inc.*, 99 B.R. 946 (Bankr.E.D.Mo.1989); *In re Barefoot*, 952 F.2d 795 (4th Cir.1991) (payment to a creditor by a check to replace a previously issued check which was returned for insufficient funds held not in the ordinary course of business, where there was no history of the parties operating in this fashion).

■ Third, Gold Force's contention that it did not make any extraordinary collection efforts, in light of the course of dealing between the parties, is not entirely accurate. The use of telephone calls to pressure a debtor into payment has been held to constitute a collection practice which takes the payment out of the ordinary course of business, especially in circumstances where phone calls were not ordinarily made in the pre-preference period. *See In re Miniscribe Corp.*, 123 B.R. 86, 94 (Bankr.D.Colo.1991) (finding phone calls and a faxed letter exerted economic pressure on debtor); *see also In re Craig Oil*, 785 F.2d at 1565 (payments deemed not in ordinary course of business due, in part, to telephone calls to pressure a debtor into payment); *compare In re Valley Steel Corp.*, 182 B.R. at 732 (persistent phone calls were normal for creditor when accounts reached a certain age). Moreover, Gold Force has failed to carry its burden of proof with respect to whether the March 13 Payment was made according to "ordinary business terms," pursuant to § 547(c)(2)(C). *See In re Roblin Industries*, 78 F.3d at 39 ("ordinary business terms" refers "broadly to customary terms and conditions used by other parties in the same industry facing the same or similar problems"). In fact, Gold Force's Vice–President, Mr. Liebtag, testified that, in the jewelry industry, payments are generally received timely. (Plaintiff's Memorandum of Law, p. 5.) This Court concludes that the March 13 Payment cannot be considered to be in the ordinary course of business, pursuant to § 547(c)(2)(B), or ac-

cording to ordinary business terms, pursuant to § 547(c)(2)(C).

█ Accordingly, the March 13 Payment, in the amount of $17,352.25, is a preferential transfer recoverable for the benefit of the estate. It is well-settled that bankruptcy courts have discretion to award pre-judgment interest in actions to recover preferential transfers, and to compute that interest from the date of demand for return of the transferred funds. *See In re Cybermech, Inc.*, 13 F.3d 818, 822 (4th Cir.1994); *see also In re Investment Bankers, Inc.*, 4 F.3d 1556, 1566 (10th Cir.1993); *see also Smith v. Mark Twain Nat'l Bank*, 805 F.2d 278, 291 (8th Cir. 1986). This Court finds that the debtor is entitled to interest on the March 13 Payment from October 12, 2001, the date of the debtor's letter to Fold Force demanding return of the funds at the applicable post-judgment rate set forth in 28 U.S.C. § 1961. *See In re All American Petroleum Corp.*, 259 B.R. 6, 21 (Bankr.E.D.N.Y. 2001).

## Conclusion

For the foregoing reasons, it is

ORDERED, that Gold Force shall immediately pay to plaintiff $17,352.25, plus interest at the statutory rate. Plaintiff may settle a judgment.